UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Ryan Smith,<br>        Plaintiff,<br><br>      v.<br><br>KILOLO KIJAKAZI,[1]<br>Acting Commissioner,<br>Social Security Administration,<br>        Defendant. | CIVIL ACTION<br>NO. 21-11052-TSH |

## REPORT AND RECOMMENDATION

**August 23, 2022**

Hennessy, M.J.

The Plaintiff, Ryan Smith, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying his Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2] (Docket #21). The Commissioner seeks an order affirming her decision. (Docket #24).

By Order of Reference dated April 6, 2022, pursuant to 28 U.S.C. § 636(b)(1)(B), (Docket #28), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted as the defendant in this matter.

[2] In general, the applicable legal standards are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

For the reasons that follow, I RECOMMEND that Smith's Motion to Reverse the Commissioner's Decision (Docket #21) be DENIED and Defendant's Motion to Affirm the Commissioner's Decision (Docket #24) be ALLOWED.

I.  BACKGROUND

A.  Procedural History

Smith filed an application for DIB and an application for SSI on April 17, 2019, alleging disability since July 29, 2018. (Tr. 208). The applications were denied initially and upon reconsideration. (Tr. 127-32; 135-43). On March 30, 2020, Smith requested an administrative hearing. (Tr. 144). Following an October 1, 2020, hearing, the ALJ rendered a decision unfavorable to Smith on November 27, 2020, finding that he had not been under a disability from July 29, 2018 through the date of the decision. (Tr. 7-26). On May 4, 2021, the Appeals Council denied Smith's request for review, making the ALJ's November 27, 2020, decision final and ripe for judicial review. (Tr. 1-5).

Having timely pursued and exhausted his administrative remedies before the Commissioner, Smith filed a complaint in this Court on June 25, 2021, pursuant to 42 U.S.C. § 405(g). (Docket #1). Smith filed the motion for reversal or remand on December 22, 2021, (Docket #21), and the Commissioner filed a cross-motion on March 1, 2022, (Docket #24). On April 14, 2022, Smith filed a reply to the Commissioner's motion. (Docket #29).

B.  Personal History

At the alleged onset date of July 29, 2018, Smith was thirty-one years old. (Tr. 208). He obtained a GED in 2002. (Tr. 232). Smith was last gainfully employed in July 2018 as a laborer and machine operator at American Paper Recycling Corporation when the company went out of business, although he had been absent most of the month prior due to mental health symptoms.

(Tr. 47-48, 232-33). Previously, he had worked as a machine operator, supervisor, laborer, and driver. (Tr. 44-47, 264-66).

C.   Medical History

Smith has a history of Deep Vein Thrombosis ("DVT") beginning in 2011, when he was diagnosed with Factor V Leiden mutation. (Tr. 347). At that time, he was successfully treated with anticoagulation medication. (Id.). In August 2016, Smith visited an emergency room reporting pain and swelling in his left leg and pain with ambulation. (Id.). He was diagnosed with a DVT of the femoral and popliteal veins. (Id.). Upon follow up examination, his leg showed no swelling. (Tr. 352). At that examination, Smith was counseled on weight loss and smoking cessation, prescribed compression stockings and one month supply of Tramadol for pain, and informed that he will likely require lifelong anticoagulation medicine. (Id.). On follow up in November 2016, Smith reported that his Restless Leg Syndrome ("RLS") continued to affect his sleep, but nothing further was reported as to his DVT. (Tr. 354-55). His primary care provider, Jiyong Lee, M.D., noted that the RLS may be a side effect of prescribed medication. (Tr. 355).

Dr. Lee referred Smith to Matthew Duncan, M.D., to review his overall condition and medications with respect to RLS and Factor V Leiden mutation and recurrent DVTs. (Tr. 356). In December 2016, Smith reported to Dr. Duncan that he struggled with RLS his entire life and attributed a fair amount of his difficulty with sleep, low energy in the day, and negative feelings about himself to his RLS and its effects. (Tr. 357). At that time, Smith reported being active and busy at work running forklifts, moving 70-pound totes, and taking over 10,000 steps a day. (Id.). He also stated that, when he is unable to sleep or his restless legs are bothering him, he becomes paralyzed by anxiety as he worries about paying bills, maintaining his home, and other stressors.

3

(Id.).  Dr. Duncan recommended that Smith develop a long-term plan to gradually diminish his medications and develop self-organization, lifestyle, and behavioral skills.  (Tr. 360).

In August 2017, Smith returned to Dr. Lee to review his progress on his RLS and mental health symptoms.  (Tr. 367).  He had missed multiple psychiatric appointments, but reported that his mood had been well-controlled, denied any conflict at work, and noted improved family relationships.  (Id.).  Dr. Lee reported that Smith was clinically doing well and had begun the process of reducing reliance on some medications.  (Tr. 369).  In an October 2017 appointment with Dr. Lee, Smith reported that he had been experiencing chronic fatigue for a few months, and that it was more noticeable in the last month.  (Tr. 377).  At that visit, Dr. Lee suspected that Smith may have had Obstructive Sleep Apnea ("OSA").  (Tr. 379).  Dr. Lee specifically noted that Smith had no leg peripheral edema.  (Id.).  In March 2018, Smith met with a sleep clinic for his suspected OSA and RLS.  (Tr 385).  The clinic recommended a home sleep test.  (Tr. 388).  Based on the results of the test, treatment with AutoCPAP was recommended.  (Tr. 390).

On July 24, 2018, Smith met with Yi Zhang, M.D., a new provider at his primary care clinic.  (Tr. 395).  At that time, Smith reported a bump on his left leg that he wanted checked because of his history of blood clots in the legs and Factor V Leiden mutation.  (Id.).  Dr. Zhang noted a raised area on the medial aspect of Smith's left lower leg but reported no surrounding erythema and no evidence of trauma.  (Tr. 397).  In August 2018, Smith established care with a new primary care provider, Alison Giuliano, PAC.  (Tr. 761-62).  At his first visit on August 30, 2018, he had no edema in his legs.  (Tr. 764).  At his follow up appointment ten days later, Smith again showed no signs of edema in his legs.  (Tr. 759).

In December 2018, Smith returned for his annual physical examination.  (Tr. 748).  He reported that he had not previously seen a vascular specialist, and that the most recent blood clot

4

in his leg had occurred about 1.5 years prior. (Id.). Smith indicated decreased sensation in his right anterior thigh. (Tr. 748, 750). Ms. Giuliano referred Smith to a vascular specialist and a RL specialist. (Tr. 751). In January 2019, Smith returned to Ms. Giuliano noting constant discomfort in his left upper abdomen, as well as nausea and vomiting when he wakes up and takes medication. (Tr. 743). Smith had no edema in his legs and did not raise concerns of continued decreased sensitivity in his right thigh. (Tr. 744-45).

Smith also met with the sleep clinic in January 2019. (Tr. 653). At that visit, Smith reported that he was never set up with the CPAP equipment after his prior sleep study. (Id.). He had no swelling, normal muscle tone, no significant deficits in strength or sensation, and a normal gait. (Tr. 655). A copy of the prior sleep study was ordered, as was CPAP equipment. (Tr. 657).

Smith saw Ms. Giuliano twice in February 2019. (Tr. 733-41). He first visited on February 19, for a medication refill. (Tr. 739). Ms. Giuliano noted Smith suffered "no lower extremity edema bilaterally." (Tr. 740). Smith returned to Ms. Giuliano on February 25, complaining of cold symptoms. (Tr. 734). Ms. Giuliano again noted "no edema" on Smith's extremities. (Tr. 736).

In March 2019, Smith returned to the sleep clinic and reported that he still had not been set up with the CPAP machine, although he had called to schedule a time to pick up the machine the day prior. (Tr. 796). He had no significant joint swelling or tenderness, normal muscle tone, no significant deficits in strength or sensation, and a normal gait. (Tr. 798). The clinician instructed Smith to return in two months. (Tr. 799).

Smith next visited the sleep clinic in August 2019, reporting that he had benefitted both from the use of the CPAP machine and changes to his medication, although he reported that the changes needed more time to "sort out." (Tr. 666). At a follow-up visit at the sleep clinic in January

2020, Smith stated that he no longer used the CPAP machine, although he was sleeping well without it and only his RLS symptoms were bothering him. (Tr. 816-17). Smith described RLS as his major medical problem. (Id.). Smith was prescribed a rotigotine patch and restiffic (compression) foot wrap. (Tr. 817). In May 2020, Smith reported that the rotigotine patch was "quite helpful," but he did notice the effect wearing off a few hours before his next patch was due. (Tr. 841). He reported he had not tried the foot wrap and had no other significant sleep-related complaints. (Id.). To increase the longevity of the rotigotine patch, the clinician increased the dose slightly. (Id.).

In September 2020, Smith visited Amanda Kravetz, M.D., for a vascular consultation. (Tr. 843). He complained of discoloration, varicose veins, and throbbing pain in his right leg. (Id.). Dr. Kravetz noted Smith had pitting edema in his right ankle, mild edema in his left ankle, and hemosiderin deposition in both calves. (Tr. 844). Dr. Kravetz instructed Smith to remain on his anticoagulation medication and to regularly wear compression stockings because they were the best treatment for DVT and edema. (Tr. 845). Smith was also instructed to return one year later for a follow up. (Id.).

D.      Medical Opinion

In September 2020, Nurse Practitioner Jaime Onofrey, who had been Smith's primary care provider since June 2020, completed a physical medical source statement on Smith's behalf. (Tr. 846). She estimated that Smith could sit for one hour at a time and stand for thirty minutes at a time. (Tr. 847). She opined that Smith could sit and stand/walk for a total of four hours each in an 8-hour working day and would need a job that permitted shifting positions at will and would sometimes need to take unscheduled breaks during the working day. (Id.). She also opined that Smith could lift up to 50 pounds frequently, had no significant limitations in reaching, handling,

or fingering, and could perform all postural activities. (Tr. 848). Nurse Onofrey noted that Smith's legs should be slightly elevated with prolonged sitting - roughly 25-50% of the time in an 8-hour working day at a sedentary job. (Id.). Finally, Nurse Onofrey opined Smith would likely be "off task" over 25% of the workday, was incapable of even "low stress" work, and that he was likely to be absent from work more than four days a month as a result of his impairments. (Tr. 849).

E.  State Agency Opinions

On February 6, 2020, Lucinda Wheelock, M.D., state agency medical consultant, reviewed the evidence and found that Smith could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; and sit, stand, and/or walk up to six hours in an eight-hour workday. (Tr. 104). Dr. Wheelock opined that Smith could frequently climb ramps and stairs, occasionally climb ladders and scaffolds, and frequently kneel, crouch, and crawl. (Id.). She found that Smith had no manipulative, visual, or communicative limitations. (Tr. 105). Dr. Wheelock opined that Smith should avoid concentrated exposure to vibrations and hazards such as machinery and heights. (Tr. 105).

F.  Hearing Testimony

The ALJ held a hearing on October 1, 2020 at which Smith, represented by counsel, and a vocational expert testified. (Tr. 38-72). Smith testified that he had major swelling in both legs due to blood clots in both legs. (Tr. 58). He testified that both legs were "bad and painful" and that to relieve the swelling he puts his legs above his heart as much as possible during the day, limited only by his inability to sit in one place due to a "blood clot disorder." (Id.). Smith stated that he could only sit for 30 minutes and stand for 20 minutes at a time before experiencing severe pain. (Tr. 58-59). He further testified that walking increases the pain and swelling in his legs, and that after 10 or 15 minutes of standing he needs to elevate his legs to reduce the swelling. (Tr. 59).

Smith testified that lifting anything, "even ten pounds," can hurt, and that his legs sometimes "just give out" on him, resulting in falls at least once a week. (Tr. 60).

Following Smith's testimony, the ALJ asked a vocational expert for her assessment on the skill and exertional levels of Smith's work history. (Tr. 69). The ALJ then asked the vocational expert to consider:

> a hypothetical individual [of Smith's age, education, and work experience]. This individual has a medical history that includes restless leg syndrome, sleep apnea, a blood clotting disorder of the lower extremities, along with varicose veins, morbid obesity, attention deficit hyperactivity disorder ["ADHD"], intermittent explosive disorder, depressive and anxiety disorders. Due to the superimposition of obesity and the lower extremity problems, [this individual is limited] to sedentary work and. . . simple rote tasks which would require or which would only impose rare changes in routine and which would not require collaboration with supervisors or coworkers other than the initiation of the assignments for the particular task that's done, and there should be no need for interaction with the public at all in terms of having to perform the tasks of the job.

(Tr. 69-70). The vocational expert responded that the hypothetical individual could not perform past work but could perform work as an addressing clerk, consisting of 13,000 jobs nationally, and a document preparer, consisting of 28,000 jobs nationally. (Tr. 70). The vocational expert further testified that none of the stated positions would be able to accommodate an individual who had to raise their legs while in a seated position. (Tr. 70-71).

G.   Administrative Decision

In assessing Smith's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits. See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is doing substantial

8

gainful activity, the ALJ will find that he is not disabled. Id. The ALJ found that Smith had not engaged in substantial gainful activity since July 29, 2018, the alleged onset date. (Tr. 13).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ determined that Smith had the following severe impairments: "Factor V Leiden Deficiency [a]ffecting lower extremities; Restless Leg Syndrome; History of Lower extremity DVT; Varicose Veins; ADHD; Intermittent Explosive Disorder; Obesity; Depressive disorder; Anxiety disorder." (Tr. 13).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. Id. The ALJ found that Smith did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment. (Tr. 14).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments. 20 C.F.R. § 404.1545(a)(1). Here, the ALJ found:

> [Smith] has the residual functional capacity to perform sedentary work[3] as defined in 20 CFR 404.1567(a) and 416.967(a), and is limited to simple routine tasks with

---

[3] "Sedentary" work:

rare changes in routine, not requiring any collaboration with supervisors or coworkers other than initial assignment of tasks and not requiring any interaction with the public to perform the functions of the job.

(Tr. 16). The ALJ determined that Smith's RFC precluded a return to any past relevant work. (Tr. 24).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ determined that, based upon his RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Smith can perform including addresser and document preparer. (Tr. 25-26). Accordingly, the ALJ found that Smith was not disabled at any time from July 29, 2018, through November 27, 2020. (Tr. 26).

II.     STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Ortiz v.

---

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.     ANALYSIS

In the portion of the RFC determination addressing Smith's physical capabilities, the ALJ limited Smith to sedentary work and found that, despite symptoms from Smith's impairments extending into his lower extremities, Smith had "no need for elevation of the lower extremities beyond that which could be accommodated on normal breaks." (Tr. 24).  Smith submits that the ALJ's omission from the RFC of a need for leg elevation was erroneous given that the ALJ found Smith's lower extremity impairments severe. (Docket #21 at 6).  Smith argues that, in formulating the RFC, the ALJ failed to address information in the record about Smith's need to elevate his leg. (Docket #29 at 2).

When assessing a claimant's RFC, an ALJ considers all the relevant medical evidence, including opinions, treatment notes, and subjective allegations.  See 20 C.F.R. § 404.1545(a)(3).

11

Because an ALJ is "not qualified to interpret raw medical data in functional terms," an ALJ's RFC assessment must be supported by medical opinions in the record. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record and need not defer to the medical opinions of a claimant's treating physician. See 20 C.F.R. § 404.1520c(a)-(b). Among the factors the ALJ must consider when evaluating the persuasiveness of a medical opinion are the length, nature, and extent of treatment and the frequency of the examination; supportability of the opinion by evidence; consistency with the record; the specialization of the treating source; and any other relevant factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(5). Where an "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (S.S.A. July 2, 1996).

Contrary to Smith's assertion, the ALJ did address the information in the record identifying Smith's vascular disorder and need to elevate his legs, including the medical opinion of Smith's primary care provider, Nurse Jaime Onofrey. The ALJ expressly noted Nurse Onofrey's clinical findings, including pain in the bilateral legs and findings of "2+ pitting edema right ankle, mild edema left ankle, hemosiderin disposition (sic) of both legs, and small varicose veins." (Tr. 22). The ALJ concluded that Nurse Onofrey's opinion was "overall somewhat persuasive," but specifically found her opinion regarding Smith's "need for elevation" inconsistent with Smith's longitudinal treatment history. (Tr. 22-23). In making this determination, the ALJ acknowledged Smith's combination of impairments including "Factor V Leiden deficiency, RLS, DVT, and varicose veins." (Tr. 24). However, he reasoned that, "despite those diagnoses and their symptoms," there was no need for elevation of the lower extremities beyond that which could be accommodated on normal work breaks. (Id.). As support, the ALJ pointed to evidence showing

that Smith did not always have edema on examination, his strength had always been at a "full 5/5," his neurological examination was normal, and his symptoms had improved with the use of medication at the appropriate dosage. (Id.). Indeed, in contrast to the opinion of Nurse Onofrey, Dr. Kravetz, who conducted the vascular consultation, did not recommend or even discuss Smith regularly elevating his legs. (Tr. 844-45). Rather, Dr. Kravetz recommended compression stockings as "the best treatment for his DVT and edema." (Id.). Because a diagnosis alone does not establish the need for functional limitations, Perez v. Sec'y of Health, Ed. & Welfare, 572 F.2d 886, 887-88 (1st Cir. 1978), the ALJ properly considered the persuasiveness of Nurse Onofrey's medical opinion in the context of Smith's longitudinal treatment history to formulate the RFC.

Smith also asserts the ALJ had a duty to address other information in Smith's medical record, including the two instances of DVT and the findings of a vascular specialist from Smith's September 11, 2020, consultation. (Docket #21 at 7-8). In support of this assertion, Smith cites Melendez v. Astrue, 630 F. Supp. 2d 308 (S.D.N.Y. 2009). (Docket #21 at 8; Docket #29 at 2). In Melendez, the plaintiff argued that "the ALJ ignored findings from numerous sources of the record that he needed to keep his right leg elevated throughout the day." Melendez, 630 F. Supp. 2d at 315. In the medical record were documents in which a doctor "encouraged" Melendez to elevate his right ankle as necessary and a treatment plan that included "elevation." Id. The court concluded that "the ALJ ought to have acknowledged the matter and included it in his weighing of the evidence." Id. The court remanded the case, finding that the ALJ's failure to either ask Melendez any questions about his putative need to elevate his legs or discuss it in his ruling violated the ALJ's legal duty to adequately develop the record. Id.

Melendez is distinguishable. Here by contrast, in weighing the evidence to formulate the RFC, the ALJ expressly acknowledged Smith's two prior instances of DVT and the findings of a

vascular specialist from Smith's September 11, 2020 vascular consultation. (Tr. 19). Addressing this consultation with Dr. Kravetz at Baystate Heart and Vascular on September 11, 2020, the ALJ recounted the medical record indicating that Smith was being seen "for his Factor V Leiden Deficiency and bilateral leg DVTs," and noted Smith's two prior DVTs in 2011 and 2016. (Id.). The ALJ also acknowledged the presence of varicose veins and right leg pain at the time of the visit, as well as clinical findings including:

> 2+ pitting edema to the right ankle and mild edema to the left ankle. He had hemosiderin deposition in the right calf from the mid-calf to the ankle. There was hemosiderin deposition in the left calf. There was (sic) some small varicose veins noted in the left calf. He had small varicose veins in the left calf. Ultrasound repots [sic] documented DVTs in both lower extremities involving calf veins. There was also evidence of continued thrombosis of the veins although they were re-canalized and it was informed to the claimant that the clot would not likely improve until completely resolved.

(Id.). Contrary to Smith's assertion, the ALJ properly acknowledged – indeed, recited – the relevant medical evidence from Smith's history in formulating the RFC. Hence, I find that the RFC the ALJ formulated is supported by substantial evidence.

IV.     CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Smith's Motion to Reverse the Commissioner's Decision (Docket #21) be DENIED and Defendant's Motion to Affirm the Commissioner's Decision (Docket #24) be ALLOWED.[4]

/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[4] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).